IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

ANGUS F. MCDUFFIE, *et al.*,   *

   Plaintiffs,   *

vs.   *

                   CASE NO. 3:19-CV-87 (CDL)

DAN SAUTNER, *et al.*,   *

   Defendants.   *

---

ORDER and PRELIMINARY INJUNCTION

The parties in this action are shareholders in the same corporation. Plaintiffs believe that they collectively own a majority of the shares, while Defendants contend that they now own the controlling stake in the company. Each side seeks a preliminary injunction to prevent the other from controlling the company. The resolution of the pending motions for preliminary injunctive relief depends on which side has a substantial likelihood of succeeding on the issue of who has the controlling stake in the company.[1] For the reasons explained in the remainder of this Order, Defendants have a majority of the voting shares, and thus they are entitled to a preliminary injunction that prevents Plaintiffs from interfering with their management of the company.

---

[1] The parties agree that the other essential elements for the issuance of preliminary injunctive relief are not at issue.

BACKGROUND

In August 2019, Defendants began what Plaintiffs describe as a "hostile takeover" of SmallBizPros, Inc. ("the Company"). Prior to that time, Plaintiffs and Defendants were shareholders in the Company, which was largely managed by Plaintiffs. Dissatisfied with that management arrangement, Defendants Dan Sautner and Brian Austin purchased additional common shares from some existing shareholders through two entities which they controlled, Hawthorne 2018, LLC ("Hawthorne") and 619047 Ontario Ltd. ("Ontario"). These transactions gave Sautner and Austin effective control of the Company. The shareholders aligned with them, including Hawthorne, Ontario, and the other Defendants in this action, voted to oust the current Board of Directors and management team, which is represented in this action by Plaintiffs. The dispositive issue to be resolved for purposes of deciding the dueling motions for preliminary injunction is which side is substantially likely to establish that it controlled a majority of the voting shares.

DISCUSSION

**I. The Hawthorne and Ontario Purchases**

If the Hawthorne and Ontario share purchases are recognized, then Defendants control a majority of the common shares in the Company. Plaintiffs argue that these purchases should not be recognized because the transactions were never

properly reflected on the Company's records after the sales were allegedly consummated, and the transactions are void because the Company had an enforceable right of first refusal which it was not given the opportunity to exercise.

The Court finds Plaintiffs' failure to record the shares argument unpersuasive. After the purchases were consummated, a letter was delivered on September 19, 2019, to the Company directing that the share certificates for the shares be transferred to Hawthorne and Ontario. Compl. Ex. K, Transfer Agent Instruction Letter (Sept. 19, 2019), ECF No. 1-12. The next day, Hawthorne, Ontario, Sautner, and Brian and Elizabeth Austin—claiming to be the holders of the majority of the outstanding shares of common stock—voted to remove the Company's incumbent directors and install new directors via action of the shareholders taken by written consent in lieu of a special meeting. Compl. Ex. O, Action of the Shareholders of SmallBizPros, Inc. Taken by Written Consent in Lieu of Special Meeting (Sept. 20, 2019), ECF No. 1-16. Then, the new directors voted to remove the Company's officers and install new ones.

The Company's bylaws of course contemplate that after shares are sold, the change in ownership shall be reflected on the Company's records. Those bylaws provide: "The Corporation shall be entitled to treat the holder of record of any share or shares as the absolute owner thereof for all purposes and,

3

accordingly, *shall not be bound to recognize any legal, equitable or other claim to, or interest in, such share or shares on the part of any other person*, whether or not it shall have express or other notice thereof, except as otherwise expressly provided by law." Defs.' Answer Ex. G, Bylaws art. V § 3(b), ECF No. 16-7 (emphasis added). The bylaws also state: "Transfers of shares of the Corporation shall be made on the share records of the Corporation only by the holder of record thereof, in person or by his duly authorized attorney, upon surrender for cancellation of the certificate or certificates representing such shares, with an assignment or power of transfer endorsed thereon or delivered therewith duly executed, with such proof of the authenticity of the signature and of authority to transfer and of payment of transfer taxes as the Corporation or its agents may require." *Id.* art V. § 3(a).

Here, with the Transfer Agent Instruction Letter, several shareholders surrendered their original stock certificates, stating that the owners had transferred their shares to Hawthorne and Ontario, and they asked that new share certificates be issued to Hawthorne and Ontario. Compl. Ex. K, Transfer Agent Instruction Letter (Sept. 19, 2019), ECF No. 1-12. The question is whether the fact that the action to oust the Plaintiffs was done after the purchase of the shares but before they had been registered voids the shareholder vote. The

4

Court finds that it does not. To find otherwise would mean that an incumbent board and management could refuse to perform the ministerial duty of reflecting the transaction on the company records and thus prevent the legitimate sale of shares from becoming consummated. It is undisputed that these shareholders sold their shares to Hawthorne and Ontario; that they surrendered those shares; and that they asked the Company to reflect the change of ownership on the Company books. The Court finds that they did not have to delay shareholder action until the incumbent management granted their request.

Plaintiffs also argue that the Hawthorne and Ontario transactions are void because the Company had a right of first refusal to purchase the shares. But Plaintiffs acknowledge that they did not present evidence of a right of first refusal restriction for any share certificates other than Certificate Nos. 29, 30, 35, and 50, which are addressed in more detail below. Rather, they pointed to Steven Rafsky's testimony that Brian Austin *was supposed to* obtain subscription agreements with such a restriction from several shareholders. There is no evidence that he ever did so. Thus, Plaintiffs did not establish that share certificates 14, 15, 17, 18, 19A, 19B, 20, 21, 22, 23, 24, 25, 53, and 54 were not validly transferred to Hawthorne and Ontario.

5

Plaintiffs presented evidence that four of the stock certificates (Nos. 29, 30, 35, and 50) were subject to the Company's right of first refusal and that the transfers to Hawthorne and Ontario were void because the Company would have exercised its right of first refusal had it been offered. But, even if these shares were subject to a valid right of first refusal such that the transfers were void, the three shareholders who attempted to sell their shares to Hawthorne and Ontario—Dan Sautner, Thornhill Consulting, and Allfax Realty— signed the October 22, 2019 shareholder action confirming that if the transfers were void then they consent to and ratify the September 20, 2019 action purporting to remove the old directors and install new ones. Defs.' Resp. to Pl.'s Mot. for Prelim. Inj. Ex. 3, Action of the Shareholders of SmallBizPros, Inc. Taken by Written Consent in Lieu of Special Meeting (Oct. 22, 2019), ECF No. 15-3. Accordingly, if the Court accepts Plaintiffs' argument that these four transfers were void, then the original shareholders should be permitted to vote their own shares. They did so on October 22, 2019, aligning themselves with Hawthorne and Ontario.[2]

---

[2] The Court notes that if the sales of these shares subject to the right of first refusal were void, then no offer to purchase the shares remained on the table and thus there was nothing for the Company to accept or refuse. It was as if the transaction never occurred. And the selling shareholders remained as shareholders.

6

The Court finds that a majority of the shares in the Company at the time the Plaintiffs were ousted were controlled by the Defendants. Accordingly, if each share represented one vote, Defendants, not Plaintiffs, are substantially likely to prevail on the merits.

II. **Weighted Voting**

Plaintiffs assert that even if they did not hold a majority of the shares, they have a majority of *votes* under an enforceable weighted voting agreement. The weighted voting agreement upon which they rely, however, was never adopted in compliance with Georgia law. Accordingly, it is not enforceable.

In general, under Georgia law, "unless the articles of incorporation provide otherwise, each outstanding share . . ., regardless of class, is entitled to one vote on each matter voted on at a shareholders' meeting." O.C.G.A. § 14-2-721(a). The Company's bylaws state, "Except as otherwise provided by statute or by the Articles of Incorporation, at each meeting of shareholders each holder of record of shares of the Corporation entitled to vote thereat, shall be entitled to one vote for each share registered in his name on the books of the Corporation." Defs.' Answer Ex. G, Bylaws art. II § 6(b), ECF No. 16-7. The articles of incorporation permit the directors to issue preferred stock and fix no voting powers to those shares.

Defs.' Resp. to Pls.' Mot. for Prelim. Inj. Ex. 7, Articles of Amendment, ECF No. 15-7; *accord* Defs.' Resp. to Pls.' Mot. for Prelim. Inj. Ex. 8, Written Consent of Directors (Apr. 26, 2007), ECF No. 15-8 (stating that the preferred shares issued to McDuffie in 2007 "shall be non-voting"). Plaintiffs did not point to evidence that the articles of incorporation provide for a voting scheme other than one-share-one-vote for common shares.

Plaintiffs nonetheless argue that the weighted voting agreement is enforceable because the shareholders may come to an agreement that governs "the exercise or division of voting power by or between the shareholders and directors or by or among any of them, including use of weighted voting rights or director proxies." O.C.G.A. § 14-2-732(a)(4). But an agreement authorized by O.C.G.A. § 14-2-732(a)(4) must be set forth in the articles of incorporation or bylaws and approved by all persons who are shareholders at the time of the agreement or in a "written agreement that is signed by all persons who are shareholders at the time of the agreement." O.C.G.A. § 14-2-732(b)(1). Based on the present record, there is no evidence that all shareholders voted in favor of a weighted voting agreement. Accordingly, each common share is entitled to one vote.

Plaintiffs' alternative argument relying upon O.C.G.A. § 14-2-731(a) is also unpersuasive. Georgia law does authorize

pooling agreements whereby "[t]wo or more shareholders may provide for the manner in which their shares will be voted by signing an agreement for that purpose." But there is no indication here that any of the shareholders entered into pooling agreements that would have an impact on the shareholder votes in question.

**III. A Hail Mary—Preferred Shares are Really Common Shares**

Plaintiffs make a final desperate argument that preferred shares held by Angus McDuffie are really common shares and thus they should be counted in determining who has the majority control of the Company. Specifically, Plaintiffs claim that McDuffie holds 74,942.652 shares of common voting stock, instead of 50,801.709 shares of common voting stock and 24,140.943 shares of preferred nonvoting stock as the Company's records show. It is undisputed that if all of McDuffie's shares were counted as voting stock, then Plaintiffs would control a majority of the shares.

In 2006, McDuffie cancelled a promissory note for $3.6 million in exchange for common stock in the Company. On April 26, 2007, the shareholders who were present at a special shareholders meeting, including McDuffie, unanimously voted to amend the Company's articles of incorporation to permit issuance of preferred stock. Defs.' Resp. to Pls.' Mot. for Prelim. Inj. Ex. 6, Minutes of Special Stockholders Meeting (Apr. 26, 2007),

9

ECF No. 15-6; *accord* Defs.' Resp. to Pls.' Mot. for Prelim. Inj. Ex. 7, Articles of Amendment, ECF No. 15-7. The same day, the board of directors, which included McDuffie, approved issuance of 38,625.508 shares of preferred stock and approved issuance of those shares to McDuffie in exchange for the same number of shares of common stock. Defs.' Resp. to Pls.' Mot. for Prelim. Inj. Ex. 8, Written Consent of Directors (Apr. 26, 2007), ECF No. 15-8. The board canceled McDuffie's common stock certificates Nos. 45 and 47 and issued a new stock certificate, No. 49, for the preferred shares. *Id.* The Company has since treated these shares as preferred and listed them separately on its schedules of shares. McDuffie later sold 14,484.565 shares of the preferred stock back to the Company.

Plaintiffs argue that it "appears that not all steps necessary to effectuate this exchange occurred." Pls.' Supplemental Mem. in Supp. of Mot. for Prelim. Inj. Specifically, Plaintiffs point out that O.C.G.A. § 14-2-602(d) requires a company to file with the secretary of state articles of amendment setting forth, among other things, the text of the amendment determining the terms of the class of shares. The statute states that these articles of amendment must be filed with the secretary of state before issuing any shares of the new class. *Id.* Here, although the shareholders voted to amend the articles of incorporation and the board of directors voted to

issue shares of preferred stock on April 26, 2007, the Company did not submit the amended articles of incorporation reflecting the new preferred stock to the Georgia secretary of state until June 8, 2007. Plaintiffs, however, did not point to any authority that shares issued after the articles of amendment are passed but before the official filing of the articles of amendment are void. The overwhelming evidence establishes that McDuffie's preferred shares were what he and the Company treated them to be before the current predicament arose—nonvoting preferred shares. They cannot be considered otherwise.

## CONCLUSION

Based on the present record, a majority of the shareholders of common voting stock voted on October 22, 2019 to remove the old board of directors and install a new board of directors. Thus, Plaintiffs have not established a substantial likelihood of success on the merits and they are not entitled to a preliminary injunction. In contrast, the present record shows that Defendants were the controlling shareholders. The Court therefore finds that Defendants are entitled to the relief they seek. Plaintiffs' motion (ECF No. 2) is denied, and Defendants' motion (ECF No. 21) is granted. The Court issues the following preliminary injunction:

PRELIMINARY INJUNCTION

1. Plaintiffs and the Old Board of Directors (which consists of those persons who served prior to the actions of the Defendants ousting them that are the subject of this action) shall be restrained from purporting to act as the Company's Board of Directors;

2. Plaintiffs shall be restrained from attempting to enforce the purported Weighted Voting Plan;

3. Plaintiff Steven Rafsky shall be restrained from purporting to act as the Company's Chief Executive Officer;

4. Plaintiffs shall be restrained from holding themselves out to employees, franchisees, or third parties as representing the management of the Company; and

5. Plaintiffs shall be restrained from interfering with Defendants' management of the Company.

6. Defendants shall post a bond in the amount of $10,000 within ten days of today's order for the duration of the preliminary injunction.

IT IS SO ORDERED, this 8th day of November, 2019.

S/Clay D. Land
CLAY D. LAND
CHIEF U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA